[Cite as *Struewing v. Village of Yellow Springs*, 2014-Ohio-1864.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

KENNETH L. STRUEWING, et al.          :

    Plaintiffs-Appellees          :          C.A. CASE NO.    2013 CA 21

v.                                    :          T.C. NO.    09CV1048

VILLAGE OF YELLOW SPRINGS             :          (Civil appeal from
                                                 Common Pleas Court)
    Defendant-Appellant           :

                                      :

. . . . . . . . . .

# O P I N I O N

Rendered on the ____2nd____ day of _____May_____, 2014.

. . . . . . . . . .

ARTHUR R. HOLLENCAMP, Atty. Reg. No. 0020528, 130 W. Second Street, Suite 2107, Dayton, Ohio 45402
    Attorney for Plaintiffs-Appellees

JOHN C. CHAMBERS, Atty. Reg. No. 0029681 and TERENCE L. FAGUE, Atty. Reg. No. 0018687 and SASHA ALEXA M. VANDEGRIFT, Atty. Reg. No. 0080800, 33 W. First Street, Suite 600, Dayton, Ohio 45402
    Attorneys for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

{¶ 1}    The Village of Yellow Springs appeals from a judgment of the Greene County Court of Common Pleas, which adopted the magistrate's ruling (with one

modification) and held that a 1974 written easement granted by Howard Kahoe to the Village to construct, maintain, and operate sanitary sewer and water lines on his property was valid and enforceable. The trial court ordered specific performance under the terms of the easement and that the Village pay $10,244 plus statutory post-judgment interest to Kenneth and Betheen Struewing, the current owners of the property, for the cost of digging a well on their property.

{¶ 2}    The Village raises six assignments of error. It claims that the easement is void because it violated R.C. 2921.42 and the Village did not adopt the easement, that the trial court erred in denying the Village's easement by estoppel claim, that the trial court erred in finding that the Struewings had a right to tap into the water line, that the trial court erred in ordering the Village to pay for the installation costs for a well, and that the Struewings' claims were barred by their respective statutes of limitations. For the following reasons, the trial court's judgment will be affirmed.

I.

{¶ 3}    In September 2009, Kenneth and Betheen Struewing brought suit against the Village of Yellow Springs due to the Village's denial of the Struewings' request for a free water and sewer tap-in for their property. The Struewings alleged that, in 1974, the Village had received an easement to construct, maintain, and operate sanitary sewer lines and water lines on and through the real property now owned by them, that the easement entitled them to one free water and sewer tap, that the Village had installed the sanitary and water lines pursuant to the easement, and that such lines have been in continuous use since installation. The Struewings sought a declaratory judgment regarding the validity of the easement (Count

One) and specific performance of the easement (Count Two). As alternatives to their specific performance claim, the Struewings also alleged equitable estoppel, breach of contract, trespass, and ejectment. With permission of the trial court, the Struewings later added a claim for damages, stating that the denial of their water tap-in request forced them to dig a well in order to provide water service to the main residence on the property.

{¶ 4} In its answer, the Village denied that it had received and accepted the grant of the easement in 1974, and it denied that it had provided or agreed to provide water and sewer tap-ins to either the Struewings or their predecessors. The Village raised numerous affirmative defenses, and it asserted three counterclaims: (1) a declaratory judgment as to the rights of the parties concerning the water and sewer tap-ins, (2) quiet title as to the Village's easement interest, and (3) a preliminary and permanent injunction to enjoin the Struewings from altering or removing the sewer and/or water lines.

{¶ 5} In June 2011, the Village moved for summary judgment, arguing, among other things, that the Struewings' claims were barred by the statutes of limitations and that the easement was void because it had not been authorized by the Village Council. The trial court denied the motion.

{¶ 6} A magistrate conducted a bench trial on July 21-22, 2011. On April 6, 2012, the magistrate issued a decision, concluding that the Struewings were entitled to specific performance on the easement and to damages of $10,244, representing the cost to dig the well. In so holding, the magistrate made detailed factual findings. Given our standard of review (¶10-12, infra), we quote those findings extensively:

Facts

Howard Kahoe was the Village of Yellow Springs Manager from the 1950s to 1974. As Manager, he was integrally involved with the everyday operation of the Village. In the late 1950s, early 1960s, the Village of Yellow Springs was experiencing problems with its water and sewer systems in that it could not keep up with demand. The problem needed to be addressed so Woolpert Consultants (Woolpert), Dayton, Ohio, a company who designed sanitary systems for governmental agencies, was hired by the Village to consult and design what would later become known as the South Side Sewer Project.

John Eschliman was employed as an engineer by Woolpert from 1948-1978 (he actually knew Village Manager Howard Kahoe). Mr. Eschliman was enlisted to help design the new sanitary sewer system. He was deposed by counsel and gave his best recollection of the events related to the South Side Sewer Project. Mr. Eschliman stated *that at the time most of the Village of Yellow Springs' water came from the north part of town. In order to increase the water supply for the Village water had to be piped in from the southeast part of the Village, outside the village actually. See* deposition of John Eschliman, p.19. He testified that the most cost-effective design would be gravity-based as opposed to one utilizing a pump station. He also opined that flow rate was important because of the use of the system by the fire department and other enterprises other than homeowners. It can also affect the amount you pay for insurance. Although Mr. Eschliman did discuss the need for cost effective easements for the Project and how future

connections were customary consideration for easements, he was unable to comment on the easement given to the Village by Mr. Kahoe (he did comment on the fact that Mr. Kahoe did not want the sanitary sewer system to cross his property unless it was cheaper for the Village.) Moreover, it was agreed that in order to hold down the cost of the system, the Village, rather than purchasing the necessary land for the South Side Sewer Project, would have to seek alternative means, such as easements. *See* Deposition of Bruce Rickenbach, Assistant Village Manger to Howard Kahoe/Village Manager in 1974, who testified in order to reduce cost, it was customary to grant property owners tap-ins to the property owners [sic] in exchange for the easement. Ultimately, by 1963 the South Side Sewer Project was built, at least in part, on land owned by Howard Kahoe. *See* Defendant's Exhibit A, an as-built drawing of sanitary sewer line. However, at the time, no easement was recorded with regard to the Kahoe property.

The Kahoe Easement

Howard Kahoe remained the Village Manager until 1974 when he was succeeded by his assistant Bruce Rickenbach. At around the same time Phillip Aultman, longtime Village Solicitor, prepared and recorded an Easement purportedly granting the Village of Yellow Springs the right to access the Kahoe property for the already completed South Side Sewer Project. The Easement on its face reveals in relevant part the following:

KNOW ALL MEN BY THESE PRESENTS:

Margaret W. Kahoe and Howard Kahoe, wife and husband, for and in consideration of One dollar ($1.00) and Other Good and Valuable Considerations, the receipt of which is hereby acknowledged, do hereby grant unto the

VILLAGE OF YELLOW SPRINGS

Greene County, Ohio

its successors and assigns, the right and authority to enter upon the following lands for the purpose of constructing, laying, maintaining, operating and removing a sanitary sewer line and water line and appurtenances thereto on and under the following described real estate: * * *

The easements herein granted shall have no other cost associated with the permissions herein outlined, except that there shall be allowed one free water and sewer tap for each parcel of real estate described above, and the right to make further taps shall be allowed when charges are paid that are commensurate with similar charges levied elsewhere in the Village of Yellow Springs. The removal of any or all tap benefits shall be cause for this easement to become null and void, and the Village of Yellow Springs herewith acknowledges that such circumstances are sufficient grounds for the owners of the above described real estate to demand immediate removal of all

water and sewer lines, and to further demand that the land be returned to its original condition. * * * *See* Exhibit A, attached to Plaintiff's Complaint.

On its face, the document setting forth the terms of the Easement, grants the Village the right to use Kahoe property to construct, lay, maintain, and operate a sanitary sewer system.

The Struewings['] application for tap-ins

In 2005, the Struewings purchased 42 acres of the Kahoe property with the attached Easement. The specific property is contiguous with the Village, but located outside the incorporated Village of Yellow Springs. Mr. Struewing purchased the property because of its relative value based upon existing sewer lines. *See* deposition of Ken Struewing, p.25. He claims it is worth more now and in the future because of the existing sewer lines. When Mr. Struewing decided to request tap-ins he had conversations with the Village as reflected in the Village Manager's Report. *See* Exhibit J, Village of Yellow Springs April 3, 2009, Manager's Report which provides in relevant part: *7. Water Extension to Unincorporated Area Petition - Ed Amhrein has informed me that he has been in conversations with Ken Struewing about his interest in tapping into the Village water distribution system in order to provide service to two parcels outside the Village limits. No extension of Village-owned infrastructure would be required, as there is currently a*

*hydrant on one of the properties in question, so there will be no cost to the Village in granting the permit. The properties are located on the north side of Hyde Road; one is at the corner of Spillan Rd. and the other is the second parcel to the west, the former Kahoe house. The petition to Village Council is expected sometime in the next few weeks.* Subsequently, Mr. Struewing made his application for tap-ins, but it was denied by Village Council. *See* Depositions of Ken Struewing and Mark Cundiff; *see also* Exhibit A, letter from Village Solicitor, John C. Chambers to Village Manager Mark Cundiff, attached to Plaintiffs' Response to Defendant's Pending Motion for Summary Judgment, and Motion for Sanctions. The Village's position was that the Easement was never formally accepted by Council and is void and unenforceable. See R.C. 721.03, which reads in relevant part: *No contract, except as provided in section 721.28 of the Revised Code, for sale of or lease of real estate belonging to a municipal corporation shall be made unless authorized by an ordinance,* * * * Also, it is Village policy that it does not extend municipal water and sewer service to properties outside the village unless the request is due to chemical contamination or health concerns. *See* Defendant's Motion for Summary Judgment and attached Exhibit No. 1, Village Charter, Article VI: Public Utilities, Section 58. Extension Beyond Corporate Limits.

(Emphasis in original.)

{¶ 7} The magistrate addressed and rejected several arguments raised by the

Village: (1) that the easement was the result of self-dealing by Howard Kahoe, (2) that the easement was void because the Village Council did not approve it, and (3) that the Struewings' claims were barred by the applicable statutes of limitations. The magistrate summarized its holding, stating:

Conclusion

Historically, the Village of Yellow Springs has obtained easements from property owners as a cost-effective means of providing utilities. In this case it seems readily apparent that the Village needed to utilize part of the Kahoe property for the South Side Sewer Project because of the location of the water and the gravity flow created by the design of the system. It is also very clear that Howard Kahoe did not want the project to cross his land unless it was the only way the Village could keep cost to a manageable level. As it turns out, the project was designed and constructed on part of his land. By the 1950s, and early 1962, the Project was complete, but no easement giving the Village the right to use the Kahoe land, had been recorded. It was not until 1974 that the actual Easement was recorded and filed away in the Village *safe* until discovered recently by Village employee Denise Swinger.

It is clear that the Village of Yellow Springs would like to continue to control the growth of the Village by regulating the extension of utilities outside the corporate limits. However, when an Easement is given by a property owner so that the Village can provide utilities to its residents, as in this case, the Village is bound by the written document. The Village cannot

reap the benefit of the Easement, but deny its obligation to perform under its terms. Defendant posits many claims to convince this Court that the Easement is invalid, but has not persuaded this Court that *a deal is not a deal.*

Counsel for the Village asked Mr. Struewing whether or not it was possible that Howard Kahoe gave the Village permission to run sewer and water lines along and across the Kahoe property without compensation. Mr. Struewing, who knew the Kahoes, stated he did not believe the Kahoes would grant the easement without compensation. Equally possible in the 1950s and 1960s in Greene County, Ohio, is that a *handshake* sealed an agreement to give an easement in return for tap-ins and the document memorializing it was prepared and recorded at a later date.

The dispute in this case as to whether the Kahoe Easement is enforceable is complicated by the lack of living witnesses from the time the South Side Sewer Project was designed and developed. However, there is a written document, clear on its face, prepared and recorded by a faithful respected Village Solicitor. The terms set forth in the document regarding future tap-ins for the granting of the Easement, are *customary*, not unusual, for the time and period. Moreover, there is no evidence to suggest that the document itself was not held by the Village in its safe with other important documents since 1974.

Howard Kahoe, the Village Manager at the time was considered an honest man who Paul Webb, former Village Councilman at the time, says

never did anything that wasn't in the best interest of the Village. Moreover, when Howard Kahoe resigned in 1974, after the preparation and recording of the Easement, *Council expressed its deepest thanks to Howard Kahoe, personally and in half of the Village, for many years of faithful and excellent service to the Village of Yellow Springs.* Apparently, at the time the Village found no fault with Howard Kahoe.

(Emphasis in original; citations omitted.) The magistrate thus ordered the Village to provide tap-ins as described by the terms of the easement. The magistrate also awarded damages of $10,244 to the Struewings, based on their claim that they needed to dig a well on their property when their application for water tap-ins was denied.

{¶ 8} The Village objected to the magistrate's decision, raising sixteen alleged errors. Upon its review, the trial court modified the magistrate's decision "to the extent that only sanitary sewer lines were installed on the Kahoe property that Plaintiffs purchased, the water lines being located on the remaining 9.87 acres of the adjacent Kahoe property." The court stated:

In this case, Howard Kahoe granted an easement to the Village of Yellow Springs to construct, maintain, and operate a sanitary sewer and water line on his property. The easement applied to the property Plaintiffs purchased and an additional 9.87 acres, all owned by Howard Kahoe at the time. The easement allowed for one free water and sewer tap for each parcel described in the easement. The easement included the Kahoe property purchased by Plaintiffs.

The trial court found that the magistrate otherwise properly determined the factual issues and correctly applied the law. The court concluded that the easement was valid and enforceable, and it approved and adopted the magistrate's decision, as modified.

{¶ 9} The Village appeals from the trial court's judgment, raising six assignments of error. We will address them in an order to facilitates our analysis.

## II. Standard of Review

{¶ 10} In accordance with Civ.R. 53, the trial court must conduct an independent review of the facts and conclusions contained in the magistrate's report and enter its own judgment. *Dayton v. Whiting*, 110 Ohio App.3d 115, 118, 673 N.E.2d 671 (2d Dist.1996). Thus, the trial court's standard of review of a magistrate's decision is de novo.

{¶ 11} An appellate court reviews the trial court's decision to adopt a magistrate's decision under an abuse of discretion standard. *Steele v. Steele*, 2d Dist. Montgomery No. 25713, 2013-Ohio- 3655, ¶ 23, citing *Proctor v. Proctor*, 48 Ohio App.3d 55, 60-61, 548 N.E.2d 287 (3d Dist.1988). An abuse of discretion means that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Presumptions of validity and deference to a trial court as an independent fact-finder are embodied in the abuse of discretion standard. *Juergens v. Strileckyj*, 2d Dist. Clark No. 2010 CA 36, 2010-Ohio-5159, ¶ 21. When applying the abuse of discretion standard, an appellate court may not merely substitute its judgment for that of the trial court. *Berk v. Mathews*, 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990); *Randall v. Randall*, 2d Dist. Darke No. 1739, 2009-Ohio-2070, ¶ 8-10.

{¶ 12} However, "[n]o court – not a trial court, not an appellate court, nor even a

supreme court – has the authority, within its discretion, to commit an error of law." *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 26 (2d Dist.). Consequently, we review de novo the trial court's application of the facts to the relevant law.

### III. Statute of Limitations

**{¶ 13}** The Village's sixth assignment of error states:

> The trial court erred by denying the Village's Motion for Summary Judgment because all of the Struewings' claims are barred by the applicable Statute of Limitations.

**{¶ 14}** The Village claims it was entitled to summary judgment, because all of the Struewings' claims fell outside of the statutes of limitations. The Village states that the applicable statutes of limitations are: (1) four years for permanent trespass, (2) six years for estoppel, (3) fifteen years for breach of contract and specific performance, and (4) twenty-one years for continuing trespass and ejectment. It asserts that the Kahoes (the Struewings' predecessors in interest) knew or shown have known of the causes of action by 1974, when the easement was recorded, and that all statutes of limitations have expired.

**{¶ 15}** The trial court rejected the Village's statutes of limitations arguments, stating:

> The Struewings purchased the Kahoe property in 2005. Prior to that time no request had been made to the Village for tap-ins. Based upon the evidence presented to this Court, it is difficult to see how the Struewings would have been aggrieved in order for the statute of limitations to run. Especially, when Mr. Struewing did not make application to the Village for

tap-ins until 2009. It was not until the Village rejected his application for tap-ins did he accrue a cause of action. Therefore the Struewings' claims are not barred by the statute of limitations with respect to enforcement of their specific rights under the Easement.

Based upon this Court's finding that the Struewings are within the statute of limitations to prosecute their claim to specifically enforce the terms of the Easement, this Court finds it unnecessary to address the Defendants' remaining defenses.

{¶ 16} We find no error in the trial court's reasoning and conclusion. The Kahoes were aware of the installation of the sanitary sewer and water lines in the 1960s and of the recording of the easement in 1974. However, until the tap-ins were requested by the Struewings and rejected by the Village, neither the Kahoes nor the Struewings knew or should have known that the Village would not allow the tap-ins, pursuant to the terms of the easement. Accordingly, the Struewings timely brought an action to enforce the easement. The Village was not entitled to summary judgment on the ground that the Struewings' action was untimely.

{¶ 17} The sixth assignment of error is overruled.

### IV. Effect of R.C. 2921.42 on Enforceability of the Easement

{¶ 18} The Village's first assignment of error states:

The trial court erred in adopting the Magistrate's decision because the Easement is void because it was created in violation of the O.R.C. § 2921.42 prohibition against self-dealing by public officials in public contracts.

{¶ 19}   In this assignment of error, the Village asserts that the easement constitutes a public contract and that it is void because Kahoe, a public official, had a personal interest in the easement, in violation of R.C. 2921.42.

{¶ 20}   R.C. 2921.42 prohibits self-dealing by public officials.   In 1974, R.C. 2921.42(A)(4) provided that "[n]o public official shall knowingly * * * [h]ave an interest in the profits or benefits of a public contract entered into by or for the use of the political subdivision or governmental agency or instrumentality with which he is connected."   A "public contract" included "[t]he purchase or acquisition, or a contract for the purchase or acquisition of property or services by or for the use of the state or any of its political subdivisions, or any agency or instrumentality of either."   Former R.C. 2921.42(E)(1).

{¶ 21}   R.C. 2921.42(C) provided an exception to the prohibitions against self-dealing by public officials.   It stated:

(C) This section does not apply to a public contract in which a public servant, member of his family, or one of his business associates has an interest, when all of the following apply:

(1) The subject of the public contract is necessary supplies or services for the political subdivision or governmental agency or instrumentality involved;

(2) The supplies or services are unobtainable elsewhere for the same or lower cost * * *;

(3) The treatment accorded the political subdivision or governmental agency or instrumentality is either preferential to or the same as that accorded

other customers or clients in similar transactions;

(4) The entire transaction is conducted at arm's length, with full knowledge by the political subdivision or governmental agency or instrumentality involved, of the interest of the public servant, member of his family, or business associate, and the public servant takes no part in the deliberations or decision of the political subdivision or governmental agency or instrumentality with respect to the public contract.

{¶ 22} The magistrate's decision recognized that Kahoe was the Village manager, a public official, when the South Side Sewer Project was designed, developed, and completed, and that he continued to be the Village manager when the easement was recorded. The magistrate further stated:

* * * [Kahoe] was integrally involved with the project as was Village Council. Further, Howard Kahoe would benefit from the granting of an easement to the Village if he was granted future tap-ins if, and when, his property was developed in the future. The witnesses who did testify in this case opined that a new sanitary sewer system was needed and that they made it clear that it was customary for the Village to obtain easements from property owners with tap-in rights to reduce the cost of utilities. It should also be noted that Mr. Kahoe did not want the South Side Sewer Project to run through his property unless it would reduce cost to the Village.

Based upon the facts presented in this matter it is apparent that Howard Kahoe was not self-dealing in this case. Council was aware that

easements were necessary to keep the cost of the South Side Sewer Project down to a manageable level. Further it was customary for easements to be given to the Village in return for tap-ins. Moreover, it was necessary that part of the Kahoe property be used for the project. Finally, the Easement was prepared and filed by the Village Solicitor. Accordingly, there is no violation of R.C. 2921.42(A)(4) in this case.

{¶ 23} Upon review of the record, we conclude that the trial court did not abuse its discretion in adopting the magistrate's findings of fact and concluding that the 1974 easement did not violate R.C. 2921.42.

{¶ 24} First, assuming that the easement constitutes a "public contract," the subject of the easement was "necessary supplies or services" for the Village. The minutes of Village Council meetings reflect that the Village was in need of greater sanitary sewer and water infrastructure in the late 1950s and early 1960s. John Eschliman, a partner of Woolpert Consultants who worked in the sanitation department, testified that the main reason for the water project in the Village was that water consumption was exceeding supply, which caused the elevated tank that held the water reservoir for fire protection to run below normal. Eschliman stated that the Village needed to increase its source of water, and the location of groundwater supply was in the southeast area outside the Village. Eschliman further testified that the Village needed to negotiate for any necessary easements before the project would be bid and that someone in the Village had to "sign off" to the United States government that the Village had the necessary easements before the federal government would give money to fund the project. An easement from the Kahoes was necessary for the

plan designed by Woolpert.

{¶ 25} Second, the record supports the trial court's conclusion that the supplies or services, i.e., the easement to permit installation of the sewer and water lines, were unobtainable elsewhere for the same or lower cost. Eschliman testified that Woolpert designed the projects, which crossed the Kahoes' property, "to be the least costly to the Village." Eschliman further stated that Howard Kahoe indicated that he would have preferred that the lines not cross his property unless it made the cost of the project cheaper for the Village; Kahoe was "not enthused" that the main water line crossed his property, but he allowed it.

{¶ 26} Third, the trial court reasonably concluded that the treatment accorded the Village was either preferential to or the same as that accorded other customers or clients in similar transactions. In this regard, the pivotal question is whether the Kahoes' right to future tap-ins constituted a benefit that others who provided easements did not receive.

{¶ 27} Evidence was presented that it was not uncommon for property owners to receive tap-in rights as consideration for sewer and water easements. John Eschliman testified that easement rights need to be obtained as part of the utility projects, and that the cost of easements is often reduced by granting future access to the property owner. Minutes of Village Council meetings reflected that the Village had previously granted tap-in rights to property owners outside of the Village. The May 20, 1974 minutes of the Village council meeting demonstrate a concern among some council members about the extension of utilities outside of the corporate limits of Yellow Springs beyond that date. The minutes noted that Rickenbach, then Village manager, had stated at the meeting that the Village

"does have existing utility lines outside the corporate limits, and 'contracts' for utility easements which included tapping rights."   A memorandum from Rickenbach to the Village Council, dated May 31, 1974 and prepared for the June 3 meeting, further explained:

> [T]he fact remains that water, sanitary sewer, and electrical utilities presently exist outside our Corporate limits.   In the case of the former two, such extensions were principally to serve residents and properties in the Corporate limits, but lie outside, simply as a matter of convenient routing, or for "grade" considerations.   Most often, these lie in easements for which the consideration is tapping privileges.   To articulate a "policy" that obviates such privileges could cost the Village dearly in the purchase of outright right-of-ways.

{¶ 28}   Two additional documents in the record indicate that the Village granted tap-in rights as part of agreements related to the sewer system.   An easement from Thomas and Lorena Newsome, recorded on February 13, 1976 (Exhibit 8), expressly included tap-in rights as consideration for a public sewer line easement.   It stated:

> * * * for and in consideration of designation of a public sewer line across their property, and the resultant potential for reimbursement by future tap fees, as described below, do hereby grant unto the VILLAGE OF YELLOW SPRINGS, Greene County, Ohio, its successors and assignments, the right and authority to enter upon a 0.054 acre tract of land designated as Parcel 36 * * *.   Such authority for entering shall be for the purpose of maintaining, operating, removing, or installing sanitary sewer lines, water

lines, taps and appurtenances thereto. Upon payment of required fees to the Village by contiguous property owners, the Village may permit such persons to utilize this public sewer line.

The easements herein granted shall have no other cost associated with the permissions herein outlined, except that, as other adjoining property owners may tap the sewerage system located within Parcel 36, any participation charge collected by the Village for such future taps, as said charges may relate to a participatory charge derivative of failure of those desiring taps to have contributed to the building of the Yellow Springs sewerage system, shall be returned to the then owners of the home located on the 0.44 acre tract located west of Parcel 36 * * *, and now owned by said Thomas A. and Lorena D. Newsome.

Additionally, a 1960 agreement between the Village and Antioch College indicated, as background to the current agreement, that the Village had purchased 5.5 acres of real estate from Hugh T. Birch in 1937 for use as a sewer disposal plant. One condition of the conveyance was that, "in the event the 78.36 acre tract described herein should be subdivided, the grantor, his heirs and assigns, shall have the right to connect with the sewer system of the said Village upon the same basis as is applicable to the residents of the Village at such time."

{¶ 29} On appeal, the Village focuses on the fact that the Loes, who also granted an easement to the Village for the South Side Sewer Project, did not obtain in their sewer

easement the right to unlimited future tap-ins.[1] The Loes' sewer easement, which was recorded on December 3, 1962, did not include tap-in rights, and there is no evidence that the Loes received money from the Village for installation of the sewer line. Nevertheless, at the time the sewer project was being planned, maps of the sewer project reflected several proposed lots on the Loes' property, the sewer line was relocated to the southern border of those proposed lots (which abutted more undeveloped property), and there was testimony that some homes on the former Loes property currently have sewer and water utilities from the Village.

{¶ 30} Given the record before us, the trial court did not abuse its discretion in adopting the magistrate's findings of fact and concluding that treatment given by the Village was the same as that accorded other customers or clients in similar transactions. The provision in the Kahoes' easement permitting future tap-ins in exchange for the sewer easement was neither uncommon nor unusual in the Village or in general.

{¶ 31} Finally, the record supports a conclusion that "[t]he entire transaction is conducted at arm's length," with full knowledge by the Village of Howard Kahoe's interest, and that Kahoe took no part in the deliberations or decision of the Village with respect to the public contract.

{¶ 32} There is no question that the Village was aware of Kahoe's interest in a portion of the properties to be used for the South Side Sewer Project. The February 20,

---

[1] The Loes provided two easements to the Village, one allowing the Village to lay and operate a water main on their property (Exhibit 16) and the one allowing the Village to lay and operate sewer lines (Exhibit 17). With respect to taps, the water easement stated, "Above water line will be tapped under Village rules and regulations prevailing at the time the tap is made."

1961 Village Council minutes discussed the division of expenses for the South Side Sewer Project. The Village proposed to pay 37.4 percent of the cost of the project, noting that the Village "will recover its costs when and if the Kahoe, Loe, and Dunlap lands develop." The Kahoes' property was clearly marked on the maps outlining the proposed and "as built" plans for the sewer line.

{¶ 33} The more difficult question is whether the evidence reasonably established that Kahoe took no part in the decision of the Village with respect to the easement. Kahoe, as Village Manager, was involved in the planning of the South Side Sewer Project, and there is no evidence that the Village Council independently, expressly authorized the tap-ins in consideration for the easement. Likewise, there is no evidence that the Village Council approved *any* easements. The record reflects, however, that the written easement was prepared by Philip Aultman, who was counsel for the Village both at the time the sewer system was planned and built and the time the Kahoes' written easement was prepared. A copy of the easement was maintained by the Village in a safe, along with other important papers of the Village. The fact that the Kahoes never developed the property and requested tap-ins from the Village is additional circumstantial evidence that the inclusion of tap-ins as consideration for the easement was part of an arm's length transaction.

{¶ 34} In light of the trial court's reasonable factual findings, we cannot find that the trial court erred in concluding that the Kahoes' easement did not constitute self-dealing by a public official, in violation of R.C. 2921.42. The Village's first assignment of error is overruled.

**V.**

{¶ 35}   The Village's second assignment of error states:

The trial court erred in adopting the Magistrate's decision that the Easement was valid when there was no evidence that the Village ever accepted the Easement.

{¶ 36}   The Village claims that the Kahoes' easement was not valid, because it was never accepted by the Village.  They argue that (1) the easement was never approved at a Village Council meeting, (2) possession of the easement is insufficient to demonstrate acceptance, (3) there was no evidence that Philip Aultman acted on behalf of the Village when the easement was drafted, (4) the easement was signed and recorded after the May 6, 1974 Village Council meeting, the last that Kahoe attended, (5) the January 15, 1962 council minutes did not approve the easement, and (6) unlimited tap-ins were not customarily granted.

{¶ 37}   The Village argues that municipal corporations, including villages, may only enter contracts for interests in real estate by passing an ordinance, approved by a two-thirds vote of the members of the legislative authority.  The Village further asserts that contracts executed in the name of a municipal corporation are not enforceable unless they are approved by the legislative authority.

{¶ 38}   The Village cites to R.C. 721.03 and *Cleveland Heights v. Cleveland*, 8th Dist. Cuyahoga No. 79167, 2001 WL 1400015 (Nov. 8, 2001) to support its claim that the Kahoes' easement was invalid without authorization from the Village Council.  Between 1961 and 2011, R.C. 721.03 provided:

No contract, except as provided in section 721.28 of the Revised Code, for

the sale or lease of real estate belonging to a municipal corporation shall be made unless authorized by an ordinance, approved by a two-thirds vote of the members of the legislative authority of such municipal corporation, and by the board or officer having supervision or management of such real estate. * * *

In *Cleveland Heights*, the Eighth District cited R.C. 721.03 in concluding that an individual (Clark) could not obtain title to a residence located next to a cemetery driveway and allegedly owned by the City of East Cleveland without evidence that the City had authorized the agreement to transfer title to her. Clark had claimed that the mayor and cemetery director of the City allowed her and her family to move into and renovate the house, with an agreement to give title to both that and another property next to the cemetery driveway after two years, in exchange for their (the Clarks') agreement to open the gates, answer visitors' questions and generally maintain the premises.

{¶ 39} The easement at issue concerned property owned by the Kahoes; it did not concern "real estate belonging to a municipal corporation," i.e. the Village of Yellow Springs. And, this action does not relate to the sale or lease of property. Both R.C. 721.03 and *Cleveland Heights* are inapplicable to the case before us.

{¶ 40} There is no evidence that the Village Council expressly discussed and approved the terms of the Kahoes' written easement. The minutes of the May and June 1974 Village Council meetings contain no references to that easement. Dorothy Scott, clerk for the Village between 1974 and 1979, testified that she would have expected the deal with the Kahoes regarding an easement in exchange for tap-ins to be reflected in the council's

minutes.

**{¶ 41}** Nevertheless, there is no indication that the Village Council expressly accepted *any* easements. Joint Exhibit I consisted of Village Council minutes from 1960 to 1975. The parties have not identified any minutes that contains the approval or rejection of any proposed easements, and the parties stipulated that the minutes did not mention the Loes' sewer easement in 1962. Paul Webb, who served on the Village Council from 1969 to 1975, testified that he was not aware of any policy that required easements to be presented to the Village Council for approval, and he was not aware of any occasion when the council was presented an easement to consider. Beverly Logan, who was on the Village Council in 1974 and 1975, did not recall if any easements were brought before the Council, and it was not "clear in her mind" whether the Village charter required that they be.

**{¶ 42}** The Kahoes' easement was prepared by Philip Aultman, who served as the Village's long-time attorney. Sharon Potter, finance director for the Village since September 2004, testified that deeds and "various other official looking instruments" had been kept in a safe in her department, and that she relocated those documents to a safe deposit box at U.S. Bank; the Kahoes' easement was among those documents. Potter further stated that she made copies of the documents before they were taken to the safe deposit box. Denise Swinger, who was a Village Council member from 2001 to 2005 and now assists the Village with archiving, testified that the safe was now located in the Village's planning department, and she located a copy of the Kahoes' easement in the safe. Although not dispositive, these facts provide circumstantial evidence that the Village was aware of and agreed to abide by the terms of the easement, particularly when the Village has

not challenged its terms in the more than thirty years after its recordation.

{¶ 43}  Finally, the February 20, 1961 minutes suggest that the Village was willing to provide tap-in rights for the Kahoes, Loes, and Dunlaps.  Discussing the financial expenditures for the sewer project, the minutes stated, in part:

South Side Sewer discussed.  Each Council Member was given a memo, and as the Village is now faced with several large financial expenditures, the following proposal was to be made to the developers:

a.  That the village will agree to pay 37.4 percent of the cost of the project (representing $26,149 out of the total estimated cost of $69,914) to pay for the sewer in land not scheduled for development at this time.

b.  That the village will recover its costs when and if the Kahoe, Loe, and Dunlap lands develop.

c.  That the owners of land about to develop can split up the remaining 62.6 percent of the cost in any way they see fit.

d.  That unless each and all of them agree to this proposal within 30 days, the offer is void, and any further agreement with the village would have to be re-negotiated.

{¶ 44}  The maps of the proposed and "as built" sewer project show that the new sewer line ran through at least two dedicated plats: the Hugh T. Birch subdivision and the Southgate subdivision.  Title Examiner James McSwiney explained that these properties did not require sewer easements, because they involved plats in which the easements were dedicated and accepted by the Village.  Nothing on the map indicated that the Kahoes

planned any imminent development of their property. The Kahoes, Loes, and Dunlaps did not pay the Village for any portion of the sewer installation, and it appears that the Village intended to cover their portion of the project, as lands not scheduled for development. However, the Village anticipated that the Village's costs could be recouped, such as through tap-in and other user fees, when or if those lands ultimately did develop. As stated above, there was evidence that tap-in rights were a common form of consideration for an easement and that the Village had previously granted those rights to others.

{¶ 45} Based on the evidence before the trial court, the trial court reasonably concluded that the Kahoes' easement was valid. The second assignment of error is overruled.

## VI. Easement by Estoppel

{¶ 46} The Village's third assignment of error states:

The trial court erred in adopting the Magistrate's decision denying the Village's easement by estoppel claim despite undisputed evidence that the Kahoes consented to the construction of the sewer line across the property.

{¶ 47} The Village argues that the Kahoes consented to the placement of the sewer line across their property and that the Village changed its position, to its detriment, by relying on that consent and installing the sewer system across the Kahoes' property. The Village's argument is premised on a conclusion that the written easement is not valid. Because the trial court did not err in concluding that the written easement was enforceable, the court did not err in denying the Village's claim of easement by estoppel.

{¶ 48} The Village's third assignment of error is overruled.

## VII.   Right to Tap Water Line

{¶ 49}   The Village's fourth assignment of error states:

Alternatively, if the Easement is valid, the trial court erred in adopting the

Magistrate's decision that the Struewings have a right to taps to a water line

off of the property, outside of the Easement.

{¶ 50}   In their fourth assignment of error, the Village claims that the trial court erred in adopting the magistrate's conclusion that the Struewings were entitled to tap into the water line, because the water line was installed on a different portion of the Kahoes' property from the sewer line and was installed as part of a different project.

{¶ 51}   The evidence at trial indicated that, in the late 1950's, the Village faced issues concerning the capacity of its sewer and water systems. By 1960, the Village was already looking into ways to improve both systems. In February 1960, the Village Council approved a resolution to cause a pressure pumping sewage disposal system to be constructed and to contract with Woolpert for engineering specifications for sewer treatment facilities. The Council also addressed obtaining additional water supply and establishing the necessary pipelines. By 1962, the Village was proceeding with plans for both the South Side Sewer Project and  the water line project, although the two projects were completed separately. The sanitary sewer line was placed on a portion of the Kahoes' property located northwest of the intersection of Spillan and Hyde Roads; this project was completed in 1963. Woolpert's as-built drawing for the water line, dated August 1964, shows that the water line spanned 713 feet of the Kahoes' 9.87 acre property located along the south side of Hyde Road. In addition, a hydrant was placed on the northwest corner of the intersection of Spillan and

Hyde Roads.

{¶ 52} The Village states that "[a]ny 'deal' struck between the Village and the Kahoes would seemingly have been struck in connection with the earlier sewer extension – not in connection with the later water line construction." However, the Village Council minutes reflect that these concerns arose around the same time and that work on the two projects overlapped, although the sewer project was completed first. We cannot say, as a matter of law, that the "deal" encompassed only the sewer line.

{¶ 53} The 1974 written easement granted the Village an easement to construct, maintain, and operate "a sanitary sewer line and water line and appurtenances thereto on and under" portions of two parcels of real estate owned by the Kahoes. The first parcel was located northwest of the intersection of Spillan and Hyde Roads; the second parcel was the 9.87 acres south of Hyde Road. The easement provided that the Kahoes would be "allowed one free water and sewer tap for each parcel of real estate described above, and the right to make further taps * * *." In addition, the removal of "any or all tap benefits shall be cause for this easement to be null and void * * * and are sufficient grounds for the owners of the above described real estate to demand immediate removal of all water and sewer lines * * *."

{¶ 54} The language of the easement grants the right to place water and sewer lines on both properties and grants one free water and sewer tap for each property. The fact that the Village decided to place a sewer line on one property (north of Hyde Road) and a water line on the other (south of Hyde Road) did not affect the Kahoes' right to tap into both the water and sewer lines on the two parcels. Although the Struewings did not purchase the

property located south of Hyde Road, they were entitled by the easement to tap into the water line due to its placement on the Kahoes' property.

**{¶ 55}** The fourth assignment of error is overruled.

### VIII. Damages for the Well

**{¶ 56}** The Village's fifth assignment of error states:

Alternatively, if the Easement for the water taps is valid, the trial court erred in adopting the Magistrate's decision ordering the Village to pay the installation costs for a well on the Property because the Struewings did not rely on the taps as the reason they purchased the Property.

**{¶ 57}** The trial court awarded $10,244 to the Struewings, representing that amount that it cost them to install a well after their request for a water tap was denied. The Village claims that this award was improper, because the Struewings were not harmed or prejudiced by the Village's decision denying them a tap to the water hydrant located on their property. The Village argues that the Struewings did not know about the water easement until after their request for taps was denied and therefore did not rely on it in purchasing the property.

**{¶ 58}** Ken Struewing purchased approximately 56 acres of the Kahoes' property from Margaret Kahoe's estate in 2005. The appraisal that he obtained in August 2005, in conjunction with the purchase, included a "subject plat map" of the property showing the location of a sewer line through the property and where natural gas and water were located at the corners of the property on Spillan Road. In 2009, Struewing requested two taps to the water distribution system for the two residences on the property. The Village denied the request.

{¶ 59}  Struewing testified that, the day after the Village denied his request, he contacted his well driller and arranged a time to meet the driller to determine a site where a new well could be drilled on the property.  The driller agreed to meet two days later, a Thursday.  On Wednesday, the day before the meeting, Struewing went to the Greene County Recorder's Office and located the Kahoe easement.  Through his attorney, Struewing attempted to resolve the issue with the Village.  When the taps were not granted, Struewing had a well drilled.

{¶ 60}  Tests were conducted on the new well in November 2010.  The first test results, dated November 19, 2010, revealed the presence of coliform bacteria.  Struewing indicated that it was not uncommon for a first test to come back positive for bacteria.  The well was "shocked with bleach" and retested.  It again came back positive for coliform organisms.  Ultimately, the well was treated with bleach four times.

{¶ 61}  At trial, Struewing provided an itemization of his expenses associated with digging of the well.  The costs included obtaining a permit, drilling the well, installing a water line from the well to the house, installing a water pump, grading the property, and shocking the well with bleach.  The total cost was $10,244.

{¶ 62}  We find no error in the trial court's award of damages to the Struewings in the amount of $10,244.  The Struewings were entitled to a water tap on the property they purchased, that tap was improperly denied by the Village, and the Struewings subsequently incurred expenses of $10,244 in order to provide water to the main house on the property – costs they would not have incurred had the tap been permitted by the Village.

{¶ 63}  The Village's fifth assignment of error is overruled.

## IX.   Conclusion

**{¶ 64}**   The trial court's judgment will be affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Arthur R. Hollencamp
John C. Chambers
Terence L. Fague
Sasha Alexa M. VanDeGrift
Hon. Michael A. Buckwalter